Slip Op. 17-14

# UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **HARMONI INTERNATIONAL SPICE, INC.,**<br><br>    **Plaintiff,**<br><br>**v.**<br><br>**UNITED STATES,**<br><br>    **Defendant.** | **Before: Claire R. Kelly, Judge**<br><br>**Court No. 17-00009**<br><br>**<u>PUBLIC VERSION</u>** |

<u>**OPINION AND ORDER**</u>

[Denying Plaintiff's motion for a preliminary injunction.]

Dated: February 7, 2017

<u>Ned Herman Marshak</u>, <u>Robert Barry Silverman</u>, and <u>Bruce M. Mitchell</u>, Grunfeld Desiderio Lebowitz Silverman & Klestadt, LLP, of New York, NY, argued for plaintiff. With them on the brief were <u>Alan Gary Lebowitz</u>, <u>Joseph Martin Spraragen</u>, and <u>Yun Gao</u>.

<u>Emma Eaton Bond</u>, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for defendant. With her on the brief were <u>Benjamin C. Mizer</u>, Principal Deputy Assistant Attorney General, <u>Jeanne E. Davidson</u>, Director, and <u>Reginald T. Blades, Jr.</u>, Assistant Director. Of counsel on the brief was <u>Chi S. Choy</u>, Attorney, Assistant Chief Counsel U.S. Customs and Border Protection, of New York, NY.

Kelly, Judge:  This matter is before the court on Plaintiff, Harmoni International Spice, Inc.'s ("Harmoni"), motion for a preliminary injunction to enjoin United States Customs and Border Protection ("Customs" or "CBP") from requiring Plaintiff to post single transaction bonds ("STB") on its entries of fresh garlic at the $4.71 per kilogram ("/kg") antidumping duty ("ADD") rate that the U.S. Department of Commerce ("Commerce") preliminarily assigned to entries of fresh garlic purchased from Zhengzhou

Harmoni Spice Co., Ltd. ("ZH") in the twenty-first administrative review of the ADD order

on fresh garlic from the People's Republic of China.  See Pl.'s Appl. TRO and Mot. Prelim.

Inj., Jan. 11, 2017, ECF No. 10 ("Pl.'s Mot."); see also Fresh Garlic From the People's

Republic of China, 59 Fed. Reg. 59,209 (Dep't Commerce Nov. 16, 1994) (antidumping

duty order) ("ADD Order"); Fresh Garlic From the People's Republic of China, 81 Fed.

Reg. 89,050, 89,051 (Dep't Commerce Dec. 9, 2016) (preliminary results and partial

rescission of the 21st ADD administrative review; 2014–2015) ("Prelim. Results") and

accompanying Decision Memorandum for the Preliminary Results of the 2014–2015

Antidumping Duty Administrative Review: Fresh Garlic from the People's Republic of

China, A-570-831, (Dec. 5, 2016) available at http://ia.ita.doc.gov/frn/summary/prc/2016-

29569-1.pdf (last visited Feb. 7, 2017) ("Prelim. Decision Memo").

Plaintiff argues that the court should enjoin CBP's determination to require it to

post STBs to obtain release of its entries of imported garlic, which are all exported by ZH,

because it has demonstrated: (1) irreparable harm would result from complying with

CBP's enhanced bonding requirement; (2) likelihood of success on the merits of its

underlying claim; (3) that Plaintiff's hardship in posting STBs outweighs any hardship to

the government; and (4) that the public interest favors enjoining CBP from requiring

plaintiff to post STBs in these circumstances.  See Pl.'s Mot. 11–28.  Plaintiff specifically

argues it lacks sufficient cash flow and assets to provide full collateral, which its sureties

would require, in connection with entries in transit.  See id. at 11.  Plaintiff argues that its

inability to provide bonding to secure release of its merchandise would cause it to suffer

a loss of goodwill and damage to its reputation due to its failure to deliver orders to

customers.  Id. at 11.  Further, Plaintiff argues that CBP lacks authority, as a matter of

law, to require it to post STBs to secure the release of its goods because a preliminary

determination that ZH's exports may be subject to antidumping duties cannot form the

basis for a decision to require enhanced security in the form of STBs. Id. at 11–25.

Defendant opposes Plaintiff's motion on the ground that Plaintiff has failed to

demonstrate any of the factors necessary to entitle it to a preliminary injunction. Def.'s

Opp'n Pl.'s Mot. Prelim. Inj. Confidential Version 11–28, Jan. 19, 2017, ECF No. 30

("Def.'s Resp. Br."). Specifically, Defendant contends that Plaintiff is unlikely to succeed

on the merits because CBP properly exercised its broad statutory authority to require

additional bonding. Id. at 11–22. Further, Defendant claims that Plaintiff has not

demonstrated it is unable to provide the collateral required to post STBs. Id. at 23. In

any event, Defendant argues Plaintiff has not demonstrated enhanced bonding would

cause it to suffer an immediate and irreparable harm before Commerce issues its final

determination. Id. at 22–23. For the reasons that follow, the court denies Plaintiff's motion

for a preliminary injunction.

## BACKGROUND

Plaintiff's underlying action challenges CBP's decision to require Plaintiff to post

STBs on its entries of fresh garlic purchased from ZH as arbitrary, capricious, and

otherwise contrary to law. Compl. ¶¶ 60–73, Jan. 11, 2017, ECF No. 2 ("Compl."). On

January 11, 2017, CBP issued a User Defined Rule ("UDR") to alert the Office of Field

Operations—including the ports and CBP's Agricultural and Prepared Products Center—

to entries of fresh garlic from China imported by Plaintiff and produced by ZH.[1] Def.'s

---

[1] A declaration from Alexander Amdur, the Director of the Antidumping Duty and Countervailing
Duty Policy and Programs Division, Office of Trade, CBP, which is annexed to Defendant's

(footnote continued)

Opp'n Pl.'s Mot. Prelim. Inj. Confidential Version Ex. A at ¶ 12, Jan. 19, 2017, ECF No.

30-1 ("Amdur Decl.").  CBP's UDR issued in this case reads, in relevant part:

> Name: CB_STB_HARMONY
>
> . . .
>
> Threat: AD/CVD
>
> . . .
>
> Action:  . . .  **DO NOT RELEASE OR MOVE TO CES, SINGLE TRANSACTION BOND & LIVE ENTRY MAY BE REQUIRED***[.] SUBMIT ENTRY TO COMMODITY TEAM FOR ACTION.  ON 9 DECEMBER IN 81 FR 89050 THE DEPARTMENT OF COMMERCE PRELIMINARILY INCREASED DUTY RATE FOR [HARMONI] . . . FROM EXPORTER [ZH] . . . .  IN LIGHT OF POSSIBLE INCREASE[D] RISK TO THE REVENUE.   PURSUANT TO 19 C.F.R. [§] 113.13(D), STB IN THE AMOUNT OF $4.71 PER KILOGRAM IS RECOMMENDED.
>
> . . .
>
> Start Date/End Date: 1/11/2017–12/31/2017.[2]

---

response, indicates that "[w]hen a UDR targeting specified criteria is in place, [CBP's] Automated Targeting system [, a computerized screening tool to target potentially high-risk cargo entering the United States,] will notify CBP personnel when entries meeting the criteria are entered into the system."  Amdur Decl. ¶ 13.  The declaration further states that "[t]he UDR . . . alerts CBP personnel to detain the relevant Harmoni entries pending a decision on whether or not to require single transaction bonds."  Id. at ¶ 14.  However, the declaration alleges that CBP's Office of Trade, which issued the UDR, "does not have the authority and responsibility to require [STBs]."  Id. at ¶ 15.  Rather, the declaration states that such authority resides in the Office of Field Operations, which includes ports of entry and CBP's Centers for Excellence and Expertise ("CEE").  Id.  The Amdur Declaration further states that the port or the CEE "can expressly request additional security in the form of an STB for each individual shipment through the issuance of a Notice of Action, CBP Form 29."  Id. at ¶ 16.

[2] CBP alleges that it has faced consistent problems with the collection of antidumping duties on entries of fresh garlic from China subject to the ADD Order.  Amdur Decl. ¶ 3.  CBP further alleges that this longstanding problem has led to a situation where

> approximately $730 million in unpaid and owed antidumping duties assessed on importations of fresh garlic from China.  This is by far the highest amount of uncollected duties for any antidumping duty or countervailing duty order.

Id.  Defendant declares that uncollected revenues in connection with the ADD Order have increased over $180 million from fiscal year 2015 to fiscal year 2016.  Def.'s Resp. Br. 3 (citing Amdur Decl. ¶ 4).  CBP claims that large amounts of unpaid and uncollected garlic duties results, in part, from

(footnote continued)

Amdur Decl. Ex. 2.   Both parties concede that CBP issued Notices of Action requiring

Plaintiff to post STBs to secure release of its entries entered in various ports of entry in

accordance with the UDR.[3]   It is likewise undisputed that, prior to CBP issuing these

Notices of Action, Plaintiff was importing subject merchandise exported by ZH from China

---

the frequent discrepancy between a low cash deposit rate assigned to a foreign
exporter and/or manufacturer and the subsequent determination by the
Department of Commerce that the entries of that particular exporter are to be
liquidated at a much higher rate. . . .  When CBP issues a bill at liquidation for the
difference between the cash deposit and the antidumping duties owed, importers
often do not pay, cannot be located, declare bankruptcy, or cease to exist.

Amdur Decl. ¶ 5.

It is undisputed that Plaintiff is the [[       ]] importer into the United States of subject
merchandise from approximately November 1, 2014 through the present.  Def.'s Resp. Br. 2
(citing Amdur Decl. ¶ 7); Pl.'s Reply Def.'s Opp'n Pl.'s Mot. Prelim. Inj. Confidential Version 5,
Jan. 26, 2017, ECF No. 37.  Defendant alleges that Plaintiff entered approximately [[        ]]
kilograms of garlic from China into the United States from November 1, 2014 to October 31, 2015
and approximately [[        ]] kilograms since November 1, 2015.  Def.'s Resp. Br. 3 (citing
Amdur Decl ¶¶ 7–8).

[3] Defendant annexes Notices of Action reflecting that CBP has required STBs in the amount of
$4.71/kg in order to obtain release of Plaintiff's shipments of Chinese garlic exported by ZH for
[[   ]] entries that entered through the ports of [[
                            ]], as of January 19, 2017.  Def.'s Opp'n Pl.'s Mot. Prelim. Inj. Public
Version Exs. B at Ex. 3, D, Jan. 19, 2017, ECF No. 31.  All of these Notices of Action contain a
materially identical explanation for requiring STBs:

On December 9, 2016, [t]he Department of Commerce issued its preliminary
determination (See 81 FR 89050) preliminar[il]y increasing duty rate for shipments
of Chinese garlic, imported by [Harmoni] . . . and exported by [ZH].  In order to
obtain release of your shipments of garlic, CBP is requiring a [STB] in the amount
of $4.71 per kilogram.

Id.  Plaintiff alleges the number of entries denied release until a bond is posted increased to [[   ]]
as of January 26, 2017.  Pl.'s Reply Def.'s Opp'n Pl.'s Mot. Prelim. Inj. Confidential Version 45,
Jan. 26, 2017, ECF No. 37.  As of the same date, Plaintiff avers that STBs totaling
$[[            ]] have been requested. Id. at 8.  Plaintiff further estimates that it has an additional
[[   ]] shipments that either landed in the United States or on the water.  Id.  Plaintiff contends
that, if CBP were to demand fully collateralized STBs for these shipments, the additional STBs
required would total approximately $[[            ]].  Id.  Plaintiff contends its liability may yet
increase further because CBP has asked for STBs after releasing shipments and has issued a
Notice of Redelivery in at least one instance.  Id. at 8–9.  Therefore, Plaintiff worries that CBP
may issue such notices in connection with other entries that have already been released.  See id.

Defendant contends that each individual port or Center for Excellence and Expertise can
review relevant information relating to those shipments and require STBs where appropriate.
Def.'s Resp Br. 6.  Defendant does not contest that CBP's issuance of notices of action represent
a determination to require STBs at least with regard to the entries in connection with which they
are issued.  See id. at 5–6.

without paying ADD cash deposits or posting STBs.  Compl. ¶ 22; Def.'s Resp. Br. 4

(citing Amdur Decl. ¶ 9).

Plaintiff alleges that CBP's representative contacted its customs broker on January

4, 2017 to advise that CBP would require Plaintiff to post STBs at the rate of $4.71/kg on

all entries of subject merchandise entered after January 9, 2017.  Compl. ¶ 7.  Plaintiff

alleges that CBP's representatives advised Plaintiff's counsel that CBP's decision to

require STBs was based on the facts that:

> (1) Harmoni is a large volume importer of [s]ubject [m]erchandise; (2) if
> Commerce's preliminary decision were affirmed by [its final determination],
> Harmoni would have a potential liability of approximately $200 million; and
> (3) Commerce's [p]reliminary [d]etermination was based on the fact that
> ZH/Harmoni had not cooperated to the best of its ability by not responding
> to Commerce's questionnaire.

Id. at ¶ 12.  Defendant avers, and Plaintiff does not deny, that Plaintiff presently provides

only a continuous bond to secure potential duties on its entries.[4]  Def.'s Resp. Br. 4 (citing

Amdur ¶ 9).  Given the actions taken by CBP to require STBs, Plaintiff states that it has

instructed ZH to cease production of garlic.  Pl.'s Reply Def.'s Opp'n Pl.'s Mot. Prelim. Inj.

Confidential Version 9, Jan. 26, 2017, ECF No. 37 ("Pl.'s Reply Br.").

Plaintiff alleges that it purchases all of its Chinese fresh garlic from ZH, which is

affiliated with Plaintiff.  Compl. ¶ 3.  Plaintiff further alleges that ZH first qualified for a zero

ADD deposit rate for subject merchandise in a New Shipper Review conducted by

Commerce for the period November 1, 2001 through October 31, 2002.  Id. at ¶ 4; see

also Fresh Garlic From the People's Republic of China, 69 Fed. Reg. 33,626, 33,629

(Dep't Commerce June 16, 2004) (final results of antidumping duty administrative review

---

[4] According to the declaration provided by CBP, Plaintiff's continuous bond is in the amount of
approximately [[          ]].  Amdur Decl. ¶ 9.

and new shipper reviews).  According to Plaintiff, garlic from the People's Republic of China ("China") exported by ZH has continuously qualified for a $0.00 cash deposit rate since May 4, 2006.  See Compl. ¶ 6.  In addition, Plaintiff alleges that, until its preliminary determination in the twenty-first annual review, Commerce had not required ZH to participate as a respondent in any annual review of the ADD Order since the tenth administrative review.  Id. at ¶ 21.

On January 7, 2016, Commerce initiated its twenty-first annual review of fresh garlic from China, selecting ZH as a mandatory respondent.  See id. ¶ 26; see also Prelim. Results, 81 Fed. Reg. at; Prelim. Decision Memo at 1.[5]  Plaintiff concedes that ZH elected not to respond to Commerce's questionnaire in its annual review because it believes "that the [New Mexican Garlic Growers Coalition's ("NMGGC")] request that Commerce review ZH was conceived in China and is controlled from China by a group of Chinese exporters who, under U.S. law, cannot file their own request."[6]  Compl. ¶ 36.

More specifically, Plaintiff avers that the review of ZH resulted from a request initiated by two individuals who are members of the NMGGC.  Id. at ¶ 25.  Plaintiff and ZH argued before Commerce that Commerce should rescind its review with respect to ZH, among other reasons, because the two members of NMGGC

---

[5] In its preliminary results, Commerce indicates that the China-wide entity is not under review because no party requested a review.  See Prelim Results, 81 Fed. Reg. at 89, 051.  Therefore, Commerce notes that the China-wide rate of $4.71/kg is not subject to change.  Id.

[6] Plaintiff asserts that, if ZH had cooperated and participated in Commerce's annual review process, ZH reasonably believes that "[its] business would be at the mercy of certain Chinese companies – who the Department already has found to be guilty of massive fraudulent conduct – for the indefinite future."  Compl. ¶ 38.  Plaintiff further claims that "these Chinese competitors would obtain the benefits of Harmoni's rate, thereby eliminating ZH's competitive advantage in selling garlic to the United States."  Id. at ¶ 39.  Plaintiff avers that "ZH was placed between a rock and a hard place, and decided to fight the NMGGC request, rather than to acquiesce in an illegal proceeding."  Id. at ¶ 40.

are merely straw men for certain Chinese exporters who, having failed in their own attempts to convince Commerce to review Harmoni, enlisted the NMGGC to act on their behalf, by filing a request controlled by the Chinese exporters.

Id. at ¶¶ 27–28.  As further support for its claim that Commerce should rescind its review with respect to ZH, Plaintiff further maintains that a recent newspaper article reported that a member of the NMGGC believes that he had been "used as a pawn" in a battle between certain Chinese exporters, ZH, and a coalition of domestic garlic producers who filed the original ADD petition on Chinese garlic.  See id. at ¶¶ 30, 46.  On December 9, 2016, Plaintiff states that Commerce issued its preliminary determination in its twenty-first review of the ADD Order, preliminarily declining to rescind its review of ZH and preliminarily concluding that ZH should be subject to a China-wide ADD rate of $4.71/kg.[7] Id. at ¶ 33; see also Prelim Results, 81 Fed. Reg. 89, 051; Prelim. Decision Memo at 8, 10, 16–17.  In its preliminary results, Commerce indicates that it "will direct CBP to assess [ADD] rates based on the per-unit (i.e., per kilogram) amount on each entry of the subject merchandise during the [period of review]."   Prelim Results, 81 Fed. Reg. 89,052. Commerce further states that it intends to issue such assessment instructions to CBP 15 days after the publication date of the final results of the review.  Id.

Plaintiff filed an application for a temporary restraining order ("TRO") requesting that the court restrain CBP from requiring Plaintiff to post STBs until the court could decide this motion for a preliminary injunction.  See Pl. Mot. 1.  On January 17, 2017, the court denied Plaintiff's TRO application.  See Memorandum and Order, Jan. 25, 2017, ECF No. 36.  In denying Plaintiff's TRO application, the court reasoned that Plaintiff failed to

---

[7] Plaintiff alleges that Commerce indicated that it had not considered certain documents submitted by ZH in pre-preliminary comments in connection with its application to rescind review of ZH and Harmoni.  See Compl. ¶¶ 28–29, 42 (citing Prelim. Decision Memo at 3 n.21, 8 n.38).

demonstrate that: (1) it would suffer irreparable harm before the court renders a decision on its preliminary injunction motion; (2) that the balance of the hardships tips in its favor; and (3) that the public interest favors granting a TRO. Id. at 11. The court also determined that Plaintiff had established inadequate likelihood of success on the merits to warrant granting a TRO before reviewing responsive briefing by Defendant. Id. at 11–12.

On January 19, 2017, the court granted Plaintiff's motion for leave to file a supplemental memorandum of law and for oral argument. See Order, Jan. 19, 2017, ECF No. 32; see also Pl.'s Mot. Leave to File Suppl. Mem. Law and Pl.'s Mot. Oral Arg., Jan. 18, 2017, ECF No. 28. The court heard oral argument on Plaintiff's motion for a preliminary injunction on January 31, 2017. See Oral Arg., Jan. 31, 2017, ECF No. 42 ("Oral Arg.").

## JURISDICTION AND STANDARD OF REVIEW

The Court has jurisdiction over this matter 28 U.S.C. § 1581(i)(4) and 28 U.S.C. § 2631(i).

USCIT Rule 65 permits the court to issue a preliminary injunction on notice to the adverse party. USCIT R. 65(a). To obtain the extraordinary relief of a preliminary injunction, the Plaintiff must establish that (1) it is likely to suffer irreparable harm without a preliminary injunction, (2) it is likely to succeed on the merits, (3) the balance of the equities favors the Plaintiff, and (4) the injunction is in the public interest. Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 20 (2008); Zenith Radio Corp. v. United States, 710 F.2d 806, 809 (Fed.Cir. 1983). In reviewing these factors, "no one factor, taken individually," is dispositive. Ugine & ALZ Belg. v. United States, 452 F.3d 1289, 1292 (Fed. Cir. 2006) (internal citations omitted); FMC Corp. v. United States, 3 F.3d 424, 427

(Fed.Cir.1993).  However, each factor need not be given equal weight.  See Ugine & ALZ

Belg., 452 F.3d at 1293; Nken v. Holder, 556 U.S. 418, 434 (2009).  Likelihood of success

on the merits and irreparable harm are generally considered the most significant factors

in evaluating a motion for injunctive relief.  See Nken v. Holder, 556 U.S. at 434;

Amazon.com, Inc. v. Barnesandnoble.com, Inc., 239 F.3d 1343, 1350 (Fed. Cir. 2001).

## DISCUSSION

### I.  Irreparable Harm

Plaintiff argues that it will suffer irreparable harm if the court does not grant its

motion for a preliminary injunction because obtaining a STB to secure the release of its

entries would require full collateral for millions of dollars of entries.  Pl.'s Mot. 11.  Plaintiff

claims that it will imminently be unable to meet its expenses as they become due once it

exhausts its limited cash on hand and its existing line of credit, either by posting STBs or

by ceasing importation.  Pl.'s Reply Br. 36–37.  Plaintiff contends that, left with no cash

to cover purchases of new inventory and deliver to customers, it will suffer a significant

and irreparable loss of goodwill and damage to its reputation.  Pl.'s Mot. 11.

Defendant responds that the harm presented by posting a STB is not irreparable

and the strains on Plaintiff's business are the result of its own business judgment.  See

Def.'s Resp. Br. 25–26;  Oral Arg. 01:32:48–01:34:05;  01:34:52–01:35:41;  01:41:10–

01:41:38.  Defendant further claims that Plaintiff has not demonstrated that it could not

take steps to alter the way it does business to avoid irreparable harm.  See Def.'s Resp.

Br. 25–26; Oral Arg. 01:32:48–01:34:05; 01:34:52–01:35:41; 01:41:10–01:41:38.  In any

event, Defendant argues that none of the harm alleged by Plaintiff is immediate because:

(1) Plaintiff has failed to demonstrate it is unable to provide collateral for STBs; and (2)

Plaintiff has not proven that it lacks sufficient capital to provide collateral on its own, nor has it detailed efforts made to raise the necessary money to post collateral.  Def.'s Resp. Br. 23.

A finding of irreparable harm requires that a Plaintiff demonstrate "a viable threat of serious harm which cannot be undone," justifying the injunctive relief sought.  <u>Zenith</u>, 710 F.2d at 809 (internal citations omitted).   Generally, an allegation of financial loss alone, however substantial, which is compensable with monetary damages, is not irreparable harm if such corrective relief will be available at a later date.  <u>See</u> <u>Sampson v. Murray</u>, 415 U.S. 61, 90 (1974).  As such, "[t]he possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm."  <u>Sampson v. Murray</u>, 415 U.S. at 90. Nevertheless, irreparable harm may take the form of "[p]rice erosion, loss of goodwill, damage to reputation, and loss of business opportunities."  <u>Celsis In Vitro, Inc. v. CellzDirect, Inc.</u>, 664 F.3d 922, 930 (Fed. Cir. 2012)).  Bankruptcy or substantial loss of business is irreparable harm because, in addition to the obvious economic injury, loss of business renders a final judgment ineffective, depriving the movant of meaningful judicial review.  <u>See</u> <u>Doran v. Salem Inn, Inc.</u>, 422 U.S. 922, 932 (1975).

Here, Plaintiff has not sufficiently met its burden to demonstrate that irreparable harm would result in the absence of the injunctive relief.  Plaintiff has demonstrated that it will suffer strains upon its cash flow by instructing ZH to cease production of garlic altogether and discontinue its importation of garlic.[8]   However, Plaintiff has not

---

[8] To evaluate Plaintiff's allegations of loss of cash flow, the court considers Plaintiff's projections assuming Harmoni will have no more fresh garlic sales because it will cease importing and decline

(footnote continued)

demonstrated that it would face immediate and irreparable loss of goodwill or damage to

its reputation if it were to obtain supply from an alternative source.  Plaintiff demonstrates

that it would face significant obstacles continuing to operate with its current supplier of

garlic, but those obstacles do not show that Plaintiff would permanently lose goodwill or

irreparably damage its reputation if it purchased garlic from alternative suppliers.[9]  More

importantly, Plaintiff fails to demonstrate that it lacks sufficient access to capital, either

---

to post STBs.  The court does not limit its evaluation of irreparable harm to entries for which CBP has already demanded that Plaintiff post STBs, which Defendant contends are the only entries ripe for review.  See Def.'s Resp. Br. 8–10.  Although Plaintiff discusses two scenarios that could conceivably constitute irreparable harm (i.e., continuing to import garlic and selling that garlic at a loss and ceasing to produce and import garlic until Commerce's final determination, see Pl.'s Reply Br. 36–37) Plaintiff states that it has already taken action to exercise the latter option by instructing ZH to cease production.  See Pl.'s Reply Br. 9.  Plaintiff has demonstrated with a detailed cash flow analysis projection from an accountant retained by Plaintiff that Plaintiff will exhaust its current cash on hand and its currently existing line of credit, and Plaintiff would be unable to meet its obligations as they become due by approximately the week ending [[

]].  Pl.'s Reply Br. 37 (citing Pl.'s Reply Def.'s Opp'n Pl's Mot. Prelim. Inj. Confidential Version Ex. E at ¶¶ 7(a)–(c), Jan. 26, 2017, ECF No. 37-5).  Plaintiff alleges that [[   ]] entries that have not been released because Notices of Action were issued by CBP requiring the posting of STBs as a condition of release.  See Pl.'s Reply Br. 8 (citing Pl.'s Reply Def.'s Opp'n Pl's Mot. Prelim. Inj. Confidential Version Ex. A at Ex. 6, Jan. 26, 2017, ECF No. 37-1); see also id. at Ex. A at ¶ 16.  Plaintiff further alleges that another [[   ]] shipments of fresh garlic are either landed or on the water.  See Pl.'s Reply Br. 8 (citing Pl.'s Reply Def.'s Opp'n Pl's Mot. Prelim. Inj. Confidential Version Ex. A at Ex. 6, Jan. 26, 2017, ECF No. 37-1); see also id. at Ex. A at ¶ 16.  It stands to reason that electing not to post STBs to secure the release of its entries may force its customers to look elsewhere for supply.  See id. at ¶ 26.

[9] Specifically, Plaintiff avers that its entire business is based on sale and distribution of its garlic products in the United States.  See Pl.'s Reply Def.'s Opp'n Pl's Mot. Prelim. Inj. Confidential Version Ex. A at ¶ 26, Jan. 26, 2017, ECF No. 37-1.  Even if Plaintiff's assertions that it cannot redirect its goods because it lacks a distribution network, customer base, or familiarity with regulatory regimes operating in other countries were true, see id., Plaintiff has not supported its claim that it cannot purchase garlic from alternative suppliers.  Rather, Plaintiff implies that it has a financial interest in maintaining its supplier relationship with ZH and that it and its customers have confidence in the quality of ZH's product.  See id. at ¶ 27.  Plaintiff provides no support for its allegation that it could not "establish an entirely new vendor network that would meet both it and its customers' requirements in the 3-5 month period before the DOC issues a final determination."  Id.  Nor has Plaintiff substantiated its claim that its product is of substantially higher quality than other sources of supply.  Thus, Plaintiff has not demonstrated that it could not purchase supply from other producers of similar quality and thereby put itself in a position to continue doing business without imminently and irreparably damaging its reputation or irreparably losing goodwill.

from existing assets or by obtaining additional financing, to continue doing business

without risking immediate and irreparable damage to its business until Commerce issues

its final determination.[10]   In short, Plaintiff has failed to demonstrate that any slowing or

discontinuation of its business while awaiting Commerce's final determination would be

---

[10] Plaintiff has provided no proof that it sought and was denied additional financing to meet its bonding requirements.  As a result, Plaintiff's claims that it could not obtain additional financing are based upon speculation from its co-owner and Chief Financial Officer, Rick Zhou, see Pl.'s Reply Def.'s Opp'n Pl's Mot. Prelim. Inj. Confidential Version Ex. A at ¶ 19, Jan. 26, 2017, ECF No. 37-1, and an accountant, Karl Knechetl, hired by Plaintiff to review its financial statements who states that he reviewed only finalized complete financial statements through September 30, 2016 and an interim internally prepared profit and loss statement for the fourth quarter of 2016. See Pl.'s Reply Def.'s Opp'n Pl's Mot. Prelim. Inj. Confidential Version Ex. E at ¶¶ 5, 8, Jan. 26, 2017, ECF No. 37-5. Even if Mr. Knechtel, were competent to opine on Plaintiff's creditworthiness before this court, something the court would not necessarily concede, see 28 U.S.C. § 2641(a) (2012) (providing that the Federal Rules of Evidence shall apply to all civil actions before the court); Fed. R. Evid. 702 (permitting a witness qualified as an expert by knowledge, skill, experience, training, or education to render an opinion if: (1) the expert's specialized knowledge will help the trier of fact to understand the evidence or determine a fact at issue; (2) the testimony is based on sufficient facts or data; (3) the testimony is the product of reliable principles and methods; and (4) the expert has reliably applied the principles and methods to the facts of the case), Mr. Knechtel's opinion is substantially undermined by the fact that he has not reviewed Plaintiff's current balance sheet.  See id. at ¶ 5.

Moreover, although Mr. Knechtel's opinion as to the imminence of Plaintiff's inability to meet expenses as they become due is entitled to some weight, he has offered no opinion as to whether or how quickly Plaintiff would be rendered insolvent in the balance sheet sense.  Nor is it clear that he could do so without having reviewed the state of Plaintiff's current balance sheet. Plaintiff's most recent financial statements prepared through the third quarter of 2016 indicate that its total assets [[          ]] its liabilities by approximately $[[               ]], including [[                    ]] in the form of approximately $[[               ]] in [[
   ]] and $[[          ]] in [[              ]].  Pl.'s Appl. TRO Prelim. Inj. Confidential Exhibits Ex. H at Ex. 9, Jan. 12, 2017, ECF No. 17.  Plaintiff's most recent financial statements also demonstrate that it generated a pre-tax net operating [[      ]] through the third quarter of 2016 of approximately $[[               ]]. Id. All these facts raise significant doubt that Plaintiff's business would be denied credit to continue operation while the court decides its motion and before Commerce issues its final determination.  These facts also raise questions as to whether Plaintiff could access alternative sources of capital to bank financing in order to continue doing business.

Finally, Plaintiff's co-owner and Chief Financial Officer, Mr. Zhou, emphasizes that Plaintiff's most recent financial statement "does not reflect the amount of taxes that will have to be paid by the shareholders of the company which is a subchapter S corporation." Pl.'s Appl. TRO Prelim. Inj. Confidential Exhibits Ex. H at ¶ 20, Jan. 12, 2017, ECF No. 17 (citing id. at Ex. 9).  Plaintiff has provided no documentation on what distributions were made to shareholders before CBP began requiring STBs.  Therefore, the court cannot evaluate the effect such distributions may have had on Plaintiff's current balance sheet.

immediate, irreparable, and out of its own control.  Plaintiff cites no authority that injunctive

relief is meant to protect a business that may elect, because of business considerations,

not to continue business where bankruptcy is not imminent and unavoidable.

Plaintiff argues that it would be unable to utilize other assets to obtain additional

financing to pay for STBs because those assets are all pledged in connection with the

company's existing line of credit.  Oral Arg. 01:20:58–01:22:04.  As an initial matter, this

argument ignores the possibility of looking to existing shareholders or outside investors

for additional capital.   In any event, Plaintiff's implication that no financial institutions

would consider either expanding Plaintiff's existing line of credit or even provide additional

junior lending is unsupported by any evidence.   Plaintiff submits no declined credit

applications  or  even  communications  with  financial  institutions.    Nor  has  Plaintiff

supported its related suggestion that Plaintiff's surety's full collateralization requirement

makes it unlikely that other lenders would provide such lending once they learn of CBP's

bonding requirement.  See id. at 01:51:38–01:51:52.  In the absence of such documented

efforts, the court declines to speculate as to whether, or on what terms, lenders might

consider lending to Plaintiff.   Moreover, Defendant suggests that Plaintiff's affiliated

producer might have as much interest in getting supply to their affiliated importer as

Plaintiff.   Oral  Arg.  01:35:10–01:35:41.   Defendant points out that ZH might either

negotiate a reduced price or arrange for delayed payment for the period until Commerce's

final determination or explore other options to provide its large affiliated importer with

greater flexibility to meet obligations.  Id.  Plaintiff offers no documentation to support its

speculation that such an arrangement would not be feasible or its implication that the

extent of such possibilities have already been exhausted.  Id. at 01:43:57–1:44:10.

## II. <u>Likelihood of Success on the Merits</u>

Plaintiff argues that CBP's determination to demand STB bonding based solely upon Commerce's preliminary determination that ZH's exports have an ADD margin of $4.71/kg is arbitrary and capricious and contrary to law because CBP's determination is tantamount to requiring cash deposits.  Pl.'s Mot. 14.  Further, Plaintiff contends that Commerce cannot require Plaintiff to post cash deposits until after a final determination in an administrative review, and it is inconceivable that CBP could take an action that forces Plaintiff to post collateral equal to cash deposits when Commerce lacks authority to impose cash deposits.  <u>Id.</u> at 15.  Defendant counters that CBP has broad statutory and regulatory authority and significant discretion to protect the revenue of the United States by requiring enhanced bonding.  Def.'s Resp. Br. 11–12 (citing Section 623 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1623 (2012);[11] 19 C.F.R. § 113.13(d) (2016)).[12]  Plaintiff demonstrates inadequate likelihood of success on the merits to warrant granting a preliminary injunction.

Even where a movant shows that it will be irreparably harmed in the absence of an injunction, "the movant must demonstrate at least a 'fair chance of success on the merits' for a preliminary injunction to be appropriate."  <u>U.S. Ass'n of Imps. of Textiles & Apparel v. U.S. Dep't of Commerce</u>, 413 F.3d 1344, 1347 (Fed.Cir.2005) (internal citations omitted); <u>Munaf v. Geren</u>, 553 U.S. 674, 690–91 (2008) (holding it is an abuse of discretion to grant a preliminary injunction because difficult legal issues are present without even considering likelihood of success).  The court will only set aside CBP's

---

[11] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2012 edition.

[12] Further citations to the Code of Federal Regulations are to the 2016 edition.

enhanced bonding determination if the agency's decision to require enhanced bonding is contrary to law or arbitrary and capricious.  Section 706 of the Administrative Procedures Act, as amended, 5 U.S.C. § 706(2)(A).[13]

CBP is authorized to require bonds or other security as it deems necessary for the protection of the revenue or to ensure compliance with laws that CBP is authorized to enforce.  19 U.S.C. § 1623(a).  CBP has promulgated regulations providing how sufficient bonding is to be determined and providing for review of bond sufficiency to protect revenue and ensure compliance with law.  See 19 C.F.R. § 113.13(b)–(c).  "CBP may immediately require additional security" if it believes acceptance of a transaction secured by a continuous bond would place the revenue in jeopardy.  19 C.F.R. § 113.13(d).

Here, considering CBP's broad authority and discretion to require enhanced bonding, Plaintiff has failed to demonstrate adequate likelihood of success on the merits to warrant a preliminary injunction.  At least where CBP has reason to conclude that the importer and merchandise in question may be subject to significant duties, the statute and CBP's regulations grant the agency broad authority and ample discretion to require additional bonding as it may deem necessary to protect revenue or to not hamper the enforcement of all applicable laws and regulations.  See 19 U.S.C. § 1623; 19 C.F.R. § 113.13(d).  Likewise, Plaintiff has failed to demonstrate CBP lacked cause to conclude that Plaintiff's continuous bond would be insufficient to cover potential ADD liability in the amount of $4.71/kg for a high volume importer like Plaintiff.  Plaintiff has failed to show that CBP lacked sufficient basis to conclude that Plaintiff would not be in a position to pay

---

[13] The court reviews actions brought under 28 U.S.C. § 1581(i), see Compl. ¶ 16, pursuant to the Administrative Procedures Act, as amended, 5 U.S.C. § 706 (2012).  See 28 U.S.C. § 2640(e) (2012).

cash deposits in the event Commerce decides not to rescind its review and adheres to its

preliminary determination.  Plaintiff concedes it has limited cash flow and a limited line of

credit insufficient to meet its expenses as they become due and to meet sureties'

collateral requirements for more than a relatively short period of time.  <u>See</u> Pl.s Mot. 11;

Pl.'s Reply Br. 37–38.  By arguing that it is financially unable "to survive with millions of

dollars being tied up" in bonds, <u>see</u> Pl.'s Reply Br. 35, Plaintiff also admits that it would

be unable to meet cash deposit requirements should Commerce not rescind its

determination to review ZH.  <u>See id.</u>  In light of the fact that the China-wide rate has not

been challenged, Plaintiff's only hope to avoid the financial harm complained of is that

Commerce will rescind its review.    <u>See Prelim. Results</u>, 81 Fed. Reg. at 89,051.

Moreover, the fact that ZH was uncooperative further justifies CBP's concerns that

allowing Plaintiff to continue importing a large volume of entries with significant potential

ADD liability would place future potential ADD revenue in jeopardy.[14]  Even if Plaintiff

ultimately succeeds in highlighting record information undermining the notion that CBP

actually based its bonding determination on concerns about Plaintiff's inability to pay, that

does not undermine the fact that CBP had a reasonable basis to conclude that Plaintiff

had a high likelihood of default and a large potential ADD liability.

---

[14] Plaintiff argues that CBP could not have reasonably concluded that an STB in the amount of $4.71/kg is necessary to protect the revenue based solely on the fact that Plaintiff's rate is based on AFA.  Pl.'s Reply Br. 18.  Plaintiff cites numerous determinations where Commerce has reversed a preliminary decision resulting in a significantly reduced rate in support of its claim. Plaintiff's Reply Br. 17–18 nn.11, 12.  However, as discussed, Plaintiff's only basis for obtaining a rate other than the $4.71/kg rate here is to convince Commerce to rescind review because ZH did not participate in the administrative review for the purposes of establishing a separate rate and the China-wide rate is not under review.  <u>See Prelim. Results</u>, 81 Fed. Reg. at 80,051.  CBP has not based its determination to require enhanced bonding solely upon Commerce's preliminary determination to apply AFA, but also upon its quantitative assessment of the scale of Plaintiff's potential ADD liability and a qualitative assessment of the likelihood that Plaintiff would be able to pay those potential liabilities in the event Commerce does not rescind its review.

**PUBLIC VERSION**

Plaintiff contends that CBP lacks authority to require enhanced bonding for potential ADD liability based on Commerce's determination of a preliminary ADD weighted-average margin.  Pl.'s Mot. 11–16; Pl.'s Reply Br. 14–21.  Plaintiff's argument flows from its premise that only Commerce may take action that imposes negative consequences based on a respondent's failure to cooperate with its administrative review of an antidumping order.[15]  Although it is true that CBP has no independent authority to require cash deposits without instructions from Commerce, Plaintiff ignores CBP's independent statutory and regulatory authority to require enhanced bonding.[16]  More importantly, CBP has not required cash deposits at all, but rather STBs in the amount of potential duties that would be owed by Plaintiff in the event Commerce does not rescind its review with respect to ZH.  The surety, not CBP, has required that such bonding be

---

[15] Plaintiff cites <u>Mitsubishi Elecs Am., Inc. v. United States</u>, 44 F.3d 973 (Fed. Cir. 1994) for the proposition that CBP is limited from taking any independent, non-ministerial action relating to the collection of antidumping duties.  <u>See</u> Pl.'s Mot. 13–14; Pl.'s Reply Br. 10–11 (citing <u>Mitsubishi Elecs. Am., Inc. v. United States</u>, 44 F.3d 973, 977 (Fed. Cir 1994).  However, in <u>Mitsubishi</u>, the Court of Appeals for the Federal Circuit held merely that an exporter may not challenge CBP's assessment of antidumping duties on its merchandise through a protest brought pursuant to 19 U.S.C. § 1514(a).  <u>Id.</u> at 978.  Moreover, in <u>Mitsubishi</u>, CBP was not acting pursuant to 19 U.S.C. § 1623 to require enhanced bonding, but rather pursuant to its ministerial role of collecting cash deposits as directed by Commerce in its final determination.  <u>See id.</u> at 975.  Although Plaintiff correctly notes that CBP may not modify Commerce's determination or the underlying facts upon which Commerce bases its determination, here CBP has acted pursuant to its independent authority under 19 U.S.C. § 1623 and its regulations to require enhanced bonding.  <u>Mitsubishi</u> does not limit CBP's authority in this regard.  <u>See id.</u>

[16] Plaintiff also implies that limiting CBP's authority to independently require enhanced bonding to circumstances where Commerce has instructed CBP to do so is consistent with the cannon of statutory construction that a specific statute controls over a general provision.  Pl.'s Reply Br. 11 (citing <u>Arzio v. Shinseki</u>, 602 F.3d 1343, 1347 (Fed. Cir 2010)).  However, the authority to determine ADDs in an administrative review, <u>see</u> 19 U.S.C. § 1675(a)(1)(B), is distinct from the power to require and collect cash deposits that flows from that authority.  <u>See</u> 19 U.S.C. §§ 1673b(d)(1)(A)–(B), 1673d(c)(1)(B)(ii)–(ii), 1673e(a)(3), and 1673g(a).  What is more, the aforementioned powers are separate and distinct from CBP's authority to require enhanced bonding.  <u>See</u> 19 U.S.C. § 1623.

secured by full collateralization.[17]  Plaintiff points to no authority requiring CBP to temper

its discretionary bonding determinations where private sureties demand security that

renders a STB as costly as requiring a cash deposit.[18]  Therefore, Plaintiff fails to establish

sufficient likelihood of success to warrant granting a preliminary injunction.

---

[17] Plaintiff relies upon Nat'l Fisheries Inst., Inc. v. U.S. Customs & Border Protection, 30 CIT 1838, 465 F. Supp. 2d 1300 (2006) ("Nat'l Fisheries I"), which it argues holds that fully collateralized STBs are functionally and legally equivalent to requiring cash deposits.  Pl.'s Reply Br. 21–24 (citing Nat'l Fisheries I, 30 CIT at 1311, 465 F.Supp. 2d 1851.  However, in Nat'l Fisheries I, the court held only that the financial consequences flowing from obtaining fully collateralized continuous bonds could be considered equivalent to cash deposits when evaluating irreparable harm.  See Nat'l Fisheries I, 30 CIT at 1311, 465 F.Supp. 2d 1851.  The court held that plaintiffs failed to meet their burden of establishing a likelihood of success on the issue of whether CBP is precluded by 19 U.S.C. § 1623 from considering potential antidumping and countervailing duty liability in setting the limit of liability for a continuous bond.  Id., 30 CIT at 1319, 465 F. Supp. 2d at 1862.  Therefore, the court did not hold that enhanced bonding is legally equivalent to requiring cash deposits in the sense that CBP's enhanced bonding authority stems from the same legal authority as Commerce's authority to require cash deposits.  Moreover, in Nat'l Fisheries, CBP imposed a very broad enhanced bonding requirement on all importers regardless of their particular circumstances.  See Nat'l Fisheries I, 30 CIT at 1311, 465 F.Supp. 2d 1851.  Here, CBP assessed the particularized magnitude of the risk and made a qualitative judgment about this particular importer's ability to, and likelihood that it would, pay based on its potential exposure.

[18] Plaintiff relies upon Nat'l Fisheries Inst., Inc. v. U.S. Customs & Border Protection, 33 CIT 1137, 637 F. Supp. 2d 1270 (2009) ("Nat'l Fisheries II"), to argue that CBP acts unlawfully when its enhanced bonding decisions under 19 U.S.C. § 1623 encroach on Commerce's responsibility to calculate ADD liability.  See Pl.'s Mot. 12–13 (citing National Fisheries, 33 CIT 1137, 1148, 1163, 637 F. Supp. 2d 1270, 1282, 1293–94 (2013)), Pl.'s Reply 12 (citing Nat'l Fisheries II, 33 CIT at 1163, 637 F. Supp. 2d at 1293–94).  As an initial matter, in Nat'l Fisheries II, the court concluded that 19 U.S.C. §§ 1673e(a)(3) or 1673g(a), which require posting of a cash deposit to secure estimated antidumping duties, do not prohibit CBP from considering potential ADD liability when setting limits of liability on continuous bonds.  See Nat'l Fisheries II, 33 CIT at 1148, 637 F. Supp. 2d at 1282.  In fact, CBP required a continuous bond for all importers equal to 100% of cash deposits for the preceding year where Commerce had also directed the collection of cash deposits.  See id., 33 CIT at 1165, 637 F. Supp. 2d at 1295.  The court declined even to limit CBP's authority to require enhanced bonding to secure potential antidumping duty liability that effectively doubled the cash deposit ordered by Commerce.  See id., 33 CIT at 1158, 637 F. Supp. 2d at 1290.  The court determined that CBP's enhanced bonding was not justified by the record, but the court explicitly declined to limit CBP from imposing some increase in bonding requirements in excess of cash deposits when an importer's particular financial situation makes it appropriate to do so.  See id., 33 CIT at 1166–67, 637 F. Supp. 2d at 1296.  Here, Defendant argues that the magnitude of Plaintiff's potential exposure and the qualitative risk arising from both Plaintiff's decision not to cooperate in Commerce's administrative review and the large potential liability caused CBP to require STBs are insufficient to justify enhanced bonding.  See Pl.'s Reply Br. 9.  Plaintiff points to nothing in the record that makes it likely that Plaintiff can show CBP lacked a basis to reach such a conclusion.

On a related note, Plaintiff argues that CBP cannot possibly have the authority to require additional security before the publication of a final determination in an administrative review because Commerce lacks such authority.  Pl.'s Mot. 14–15; Pl.'s Reply Br. 14-16.  Specifically, Plaintiff highlights Commerce's explanation for electing to correct ministerial errors in an annual review in the final results rather than by amending its preliminary results, which it argues evidences that Commerce does not amend preliminary determinations even if it discovers that a rate is incorrect due to a clerical error.  See Pl.'s Mot. 14–15; Pl.'s Reply Br. at 15–16 (citing Antidumping Duties; Countervailing Duties, 62 Fed. Reg. 27,296, 27,327 (Dep't Commerce May 19, 1997) (final rule).  Plaintiff implies that Commerce's explanation for declining to correct ministerial errors in the preliminary results of an annual review demonstrates that CBP lacks authority to attach consequences to Commerce's preliminary determinations where Commerce does not.[19]  See Pl.'s Reply Br. 14–15.  Commerce's rationale in choosing to allocate its resources appears to stem from the fact that a preliminary determination does not give rise to cash deposits.  See Antidumping Duties; Countervailing Duties, 62 Fed. Reg. 27,296, 27,327.  Commerce's recognition that its preliminary determination does not give rise to cash deposits does not evidence Congress's intent to limit CBP's authority under 19 U.S.C. § 1623.

---

[19] In response to commenters' proposal that 19 C.F.R. § 351.224(c) be amended to provide for correction of ministerial errors in preliminary results calculations because of "significant commercial harm" caused by publication of erroneous preliminary dumping margins in administrative reviews, Commerce declined to do so.  Antidumping Duties; Countervailing Duties, 62 Fed. Reg. at 27,327.  Commerce justified its determination by explaining that it did not feel it was a wise expenditure of resources to correct ministerial errors before the final results because preliminary results have no immediate legal consequences and it could not identify the "significant commercial harm" identified by the commenters.  Id.

Further, Plaintiff invokes the court's rationale in <u>Sunpreme Inc. v. United States</u>, 40 CIT __, 145 F. Supp. 3d 1271 (2016), arguing that it is inconceivable that the regulatory scheme would permit CBP, which is charged with implementing Commerce's cash deposit instructions in ADD administrative reviews, to demand enhanced bonding in an amount equivalent to the margin calculated in a preliminary determination where Commerce lacks authority to order the collection of cash deposits at the same point in a proceeding.  Pl.'s Mot. 14 (citing <u>Sunpreme Inc. v. United States</u>, 40 CIT __, __, 145 F. Supp. 3d 1271, 1287 (2016)) Pl.'s Reply Br. 16 (citing <u>Sunpreme</u>, 40 CIT at __, 145 F. Supp. 3d at 1287).  Plaintiff's reliance on the court's rationale in <u>Sunpreme</u> is misplaced. Here, CBP is acting pursuant to independent statutory and regulatory authority to require enhanced bonding in an administrative review where there is no question that the scope of the order includes Plaintiff's merchandise.  In <u>Sunpreme</u>, the court held that the regulatory scheme concerning the collection of cash deposits where the scope of an antidumping or countervailing duty order is ambiguous could not permit CBP to collect cash deposits where Commerce had no authority to order cash deposits.  <u>See</u> <u>Sunpreme</u>, 40 CIT at __, 145 F. Supp. 3d at 1286–87.  The court's holding did not address CBP's separate legal authority to require enhanced bonding.  <u>See</u> <u>id.</u>

Plaintiff also implies that CBP has usurped Commerce's authority to determine whether a respondent's actions warrant an adverse inference as well as Commerce's authority to determine whether a respondent's actions that led to such an adverse inference warrant expedited action.  <u>See</u> Pl.'s Reply Br. 11.  However, by ordering enhanced bonding, CBP has not applied an adverse inference based on Commerce's preliminary determination.  Rather, CBP has acted consistently with Commerce's own

adverse inference and determined that the magnitude of the potential risk to future revenues is commensurate with the preliminary rate determined by Commerce in its preliminary determination.  As already discussed, Plaintiff's decision not to cooperate with Commerce's administrative review combined with the fact that no party challenged the China-wide rate makes it certain that Plaintiff cannot qualify for a lower ADD rate except if Commerce rescinds its review.  See Prelim. Results, 81 Fed. Reg. at 89,051.  Thus, it is unlikely that Plaintiff will be able to demonstrate that CBP has usurped Commerce's authority to determine an ADD rate because CBP has demanded STBs only commensurate with the ADD rate determined by Commerce.  Moreover, CBP's decision to collect STBs at a rate of $4.71/kg does not foreclose the possibility of Commerce expediting its review to ensure quicker collection of cash deposits.

Next, Plaintiff argues that CBP cannot require STBs to eliminate the risk associated with the retrospective antidumping and countervailing duty assessment system in the absence of express Congressional authority to do so.  Pl.'s Mot. 16–18; Pl.'s Reply Br. 24–27.   Plaintiff cites the example of Title IV, Section 421 of the Trade Facilitation and Trade Enforcement Act of 2015 (commonly referred to as the "Enforce and Protect Act of 2015" or "EAPA"), which authorizes CBP to require enhanced bonding if it determines there is reasonable suspicion an importer is entering subject merchandise by means of a material and false statement or omission that results in the reduction of any cash deposit or applicable antidumping or countervailing duties with respect to the merchandise.  Pl.'s Mot. 16–17; Pl.'s Reply Br. 25 (citing Trade Facilitation and Trade Enforcement Act of 2015 § 517 Pub. L. No. 114-125, 130 Stat. 122, 163–67 (to be codified at 19 U.S.C. § 1517 ("EAPA")).  Plaintiff implies Congress could have granted CBP similar

authority to require enhanced bonding outside of the evasion context, but it has not done so.  See id.  But Congress has given CBP authority to secure against revenue losses in 19 U.S.C. § 1623.  EAPA gives CBP separate authority to require enhanced bonding in circumstances where Commerce could not act to secure revenues by collecting cash deposits because an importer has taken steps to evade an antidumping or countervailing duty order.  See EAPA, Pub. L. 114-125, 130 Stat. 167).  Nothing about Congress's action to permit CBP to demand additional security in the evasion context undermines Congress's separate grant of authority to CBP to require enhanced bonding under 19 U.S.C. § 1623.

Plaintiff next argues that requiring STB bonding is functionally equivalent to requiring cash deposits because Customs is aware that the financial impact would be identical to that of a decision by Commerce to require cash deposits in the same amount. Pl.'s Reply Br. 23.  Plaintiff further argues that CBP is barred from requiring Plaintiff to post STBs in an amount equivalent to a cash deposit rate based upon Commerce's preliminary determination.  See id.  As an initial matter, it is unclear that the affidavits submitted by Plaintiff establish an industry-wide practice in the surety industry of requiring full collateralization.[20]  Even if it is standard practice in the surety industry to require full collateralization to secure antidumping duties, it would not make sense to limit CBP's authority to require STBs to lower risk situations where sureties would be unlikely to require additional collateral.   The statute and CBP's regulations gives CBP more

---

[20] Plaintiff submits one affidavit from its own surety saying it will require full collateralization and documentation from the website of one other surety saying that it normally requires more collateral for STBs.  See Pl.'s Reply Def.'s Opp'n Pl.'s Mot. Prelim. Inj. Confidential Exs. B, C, Jan. 26, 2017, ECF No. 37-2–3.

discretion to consider enhanced bonding necessary where there is greater risk to the revenue.  <u>See</u> 19 U.S.C. § 1623; 19 C.F.R. § 113.13(d).

Lastly, Plaintiff attempts to distinguish other cases where the Court has sustained CBP's determinations to require enhanced bonding pursuant to 19 U.S.C. § 1623.  <u>See</u> Pl.'s Mot. 23–25; Pl.'s Reply Br. 27–33.  Plaintiff argues that the cases together stand for the proposition that CBP's authority to require enhanced bonding is limited to circumstances in CBP's own area of expertise such as verifying the truthfulness, reliability, and relevance of entry documentation submitted by an importer to qualify for a particular antidumping rate.  Pl.'s Mot. 23–25 (citing <u>Int'l Fresh Trade Corp. v. United States</u>, 38 CIT __, __, 26 F. Supp. 3d 1363, 1365 (2014) ("<u>Int'l Fresh Trade</u>"); <u>Kwo Lee, Inc. v. United States</u>, 38 CIT __, __, 24 F. Supp. 3d 1322 (2014) ("<u>Kwo Lee I</u>"); <u>Kwo Lee, Inc. v. United States</u>, 39 CIT __, __, 70 F. Supp. 3d 1369 (2015) ("<u>Kwo Lee II</u>"); <u>Premier Trading, Inc. v. United States</u>, 40 CIT __, __, 144 F. Supp. 3d 1354 (2016) ("<u>Premier Trading</u>")); Pl.'s Reply Br. 27–33 (citing Mem. and Order, Dec. 23, 2013, ECF No. 19 in <u>Yin Xin Int'l Trading Co., Ltd. and Jinxiang Hejia Co., Ltd. v. United States Customs & Border Protection</u> in Court No. 13-00392 ("<u>Yin Xin</u>"); <u>Int'l Fresh Trade</u>, 38 CIT at __, 26 F. Supp. 3d at 1365; <u>Kwo Lee I</u>, 38 CIT at __, 24 F. Supp. 3d at 1322; <u>Kwo Lee II</u>, 39 CIT at __, 70 F. Supp. 3d at 1369; <u>Premier Trading</u>, 40 CIT at __, 144 F. Supp. 3d at 1356).  Although these cases involved circumstances where CBP was investigating facts concerning the appropriateness of applying a combination ADD rate established by Commerce to individual importers, none of these cases limit CBP's authority to require

additional security pursuant to 19 U.S.C. § 1623 based upon potential ADD liability.[21]

Given CBP's broad authority and discretion to require enhanced bonding under 19 U.S.C.

---

[21] In <u>Yin Xin</u>, Plaintiff had similarly argued that, by requiring enhanced bonding that differed from the zero cash deposit rate obtained by Plaintiff in a new shipper review for respondents qualifying for a separate producer-exporter rate, CBP had intruded on the substantive authority of Commerce to determine an ADD cash deposit rate. <u>See</u> <u>Yin Xin</u> at 1–2. After initially granting Plaintiff a TRO, the court concluded it had done so improvidently because CBP thoroughly explained its quantitative and qualitative assessment of the risk to the revenue posed by Plaintiff's conduct. <u>Id.</u> at 2. CBP's inquiry involved assessing the accuracy of documentation submitted by Plaintiffs to establish the company's entitlement to a separate rate that required it to show that the company is both the producer and exporter of subject merchandise. <u>Id.</u> at 2–3. CBP recognized information calling into question whether the company is the producer, and the court concluded CBP had reasonable basis to doubt Plaintiff's entitlement to the producer/exporter separate rate. <u>Id.</u> at 3. However, the court did not address any limitations on CBP's authority under 19 U.S.C. § 1623 other than to require a thorough and comprehensive explanation of the risk to the revenue under the statutory and regulatory framework. <u>See</u> <u>id.</u> at 2–3.

Similarly, in <u>Int'l Fresh Trade</u>, CBP had imposed a STB equal to Plaintiff's potential ADD liability at the China-wide rate rather than the cash deposit rate applicable under an exporter-producer rate because of discrepant information in the imports' phytosanitary certificates and other documentation requested to verify the producer and shipper of the entries. <u>See</u> <u>Int'l Fresh Trade</u>, 38 CIT at __, 26 F. Supp. 3d at 1365. The court recognized CBP's broad authority to require additional security equal to an importer's potential ADD liability. <u>Id.</u>, 38 CIT at __, 26 F. Supp. 3d at 1369. Moreover, the court concluded that CBP did not act arbitrarily and capriciously because it relied on facts that undercut Plaintiff's claim of the identity of the exporter, which called into question Plaintiff's entitlement to the combination producer-exporter rate. <u>Id.</u> The court held that, in reaching such a determination, CBP did not make a determination regarding Chinese government control or the applicability of the China-wide rate, which the court acknowledged are Commerce's responsibility in the ADD regime. <u>Id.</u>

In <u>Kwo Lee I</u> and <u>Kwo Lee II</u>, CBP had imposed an STB in identical circumstances to those in <u>Int'l Fresh Trade</u> in that there was missing and possibly discrepant information regarding who the producer of the merchandise was to establish entitlement to a producer-exporter rate. <u>See</u> <u>Kwo Lee I</u>, 38 CIT at __, 24 F. Supp. 3d at 1329, Kwo Lee II, 39 CIT at __, 70 F. Supp. 3d at 1372; <u>Int'l Fresh Trade</u>, 38 CIT at __, 26 F. Supp. 3d at 1365. In <u>Kwo Lee II</u>, which was the court's decision on the motion for judgment on the agency record following its grant of a preliminary injunction in <u>Kwo Lee I</u>, the court held that Customs did not purport to assign the China-wide rate, but only determined that it could not identify the producer of garlic with any certainty based upon the documentation provided. <u>Kwo Lee II</u>, 39 CIT at __, 70 F. Supp. 3d at 1375.

Finally, in <u>Premier Trading</u>, the court denied a motion for a preliminary injunction and TRO because of deficiencies in the plaintiff's moving papers in attempting demonstrate irreparable harm and the plaintiff's failure to make any argument regarding the applicable law to support its assertion that it is likely to succeed on the merits. <u>See</u> <u>Premier Trading</u>, 40 CIT at __, 144 F. Supp. 3d at 1358–59. On the likelihood of success on the merits point, the court only noted the Plaintiff submitted no documentation refuting CBP's documentation demonstrating Plaintiff's connection to other importers with a pattern of non-payment or underpayment, which the court

(footnote continued)

§ 1623 where it reasonably concludes that there is a large scale exposure to potential

antidumping duties and reasonable basis to conclude that the importer would be unable

to meet potential ADD liability, the cases relied upon by Plaintiff do not demonstrate that

Plaintiff is likely to succeed on the merits of its claim.

### III. <u>Balance of the Hardships</u>

Plaintiff argues that the balance of the hardships favors granting a preliminary

injunction because Commerce's prior determinations granting it a cash deposit rate of

$0.00 continuously since May 4, 2006 demonstrate the possibility that enhanced bonding

is unnecessary to protect the revenue.  <u>See</u> Pl.'s Mot. 26 (citing <u>Kwo Lee I</u>, 38 CIT at __,

70 F. Supp. 3d at 1331–32).  Plaintiff contends that the hardship the court must evaluate

is the severe consequence of posting fully-collateralized STBs (<u>i.e.</u>, that it will be forced

out of business).  Pl.'s Reply Br. 45.  Defendant responds the risk to the government of

losing a significant sum of ADDs without a bond exceeds the harm to Plaintiff of posting

security.  Def.'s Resp. Br. 28.  Defendant contends that Plaintiff has failed to demonstrate

that posting security would force it out of business in the time before Commerce issues

its final determination.  Def.'s Resp. Br. 28.  Moreover, Defendant argues that the alleged

harm suffered by Plaintiff in posting collateral as security is an expected cost of importing

a high risk commodity such as garlic from China.  <u>Id.</u>  Plaintiff has not established that the

balance of the hardships weighs in favor of granting the preliminary injunction.

When considering a motion for preliminary injunction, the court must "balance the

competing claims of injury and must consider the effect" that granting or denying relief

---

concluded supported CBP's claim that Plaintiff poses a risk to the revenue.  <u>Id.</u>, 40 CIT at __, 144
F. Supp. 3d at 1359.  The holding in <u>Premier Trading</u> is therefore limited to the facts before the
court.  <u>See id.</u>  In any event, the court did not address limitations on CBP's authority to require
enhanced bonding under 19 U.S.C. § 1623.

would have on each party.  Winter, 555 U.S. at 24.  Here, if injunctive relief is denied,

Plaintiff would be required to post STBs on its entries until publication of Commerce's

final results, which is currently expected to be in June of 2017.  Pl. Mot. 6.  Without a bond

or some other security on Plaintiff's entries, CBP faces a significant potential loss of the

duties owed should Commerce adhere to its preliminary determination and Plaintiff is

unable to pay.[22]  Plaintiff concedes that it still may go out of business in the event

Commerce adheres to its preliminary determination in June.   Oral Arg. 00:43:01–

00:45:01.  Although Plaintiff asserts that it cannot operate in the interim while posting the

STBs, as already discussed, the documentation submitted by Plaintiff fails to establish

that posting STBs will force Plaintiff out of business before Commerce issues its final

determination.

Here, the risk to CBP that it would lose a significant sum of ADDs without bonding

exceeds the harm to Plaintiff of being forced to post security for potential ADDs.

Moreover, it would be difficult for CBP to fulfill its mandate to protect the revenues if it had

to take into account the conditions of requiring full collateralization imposed by the surety

marketplace.

Balancing the hardship also requires the court to balance the equities.  Winter, 555

U.S. at 20.  Here, it is within Plaintiff's power to avoid the risks it now faces.  Plaintiff

admits that it carefully considered its options and decided, as a business strategy, not to

---

[22] CBP estimates that the damage it would sustain in the event Commerce adheres to its
preliminary determination and Plaintiff is unable to pay would exceed $200 million for imports
entered during the 21st period of review (i.e., those between November 1, 2014 and October 31,
2015).  Def.'s Resp. Br. 21, 28.

respond to Commerce's questionnaire.[23]  Pl.'s Mot. 6.  If Commerce does not rescind its

determination to review ZH, Plaintiff would face the same financial exposure it now faces.

Plaintiff's exposure to the risk it now faces came earlier than it calculated; but it is the

same risk for which the Plaintiff bargained.  The equities cannot tip in favor of a Plaintiff

that knowingly placed its very existence at risk even if Plaintiff expected the timing of the

risks to be different.

    Plaintiff attempts to distinguish the risks to the company arising from the potential

of Commerce to require cash deposits after making a final determination from those that

it faces under CBP's STB requirement.  Plaintiff argues, in part, that its counsel would be

able to anticipate a likely negative outcome in a final determination a few months in

advance of a negative determination by Commerce after submitting case briefs and

appearing before Commerce.  Oral Arg. 00:44:01–0044:26.  Plaintiff implies that this

additional time to prepare to do business under strained circumstances distinguishes the

harm posed by CBP's bonding determination from that posed by Commerce's potential

cash deposit requirement.  See Oral Arg. 00:44:26–00:45:02.  But this argument only

serves to underscore the inequity of granting a preliminary injunction.  Plaintiff should

have anticipated that potential ADD liability was only months away, and it should have

been taking steps to place itself in a better financial position to sustain the potential harm

---

[23] At oral argument, Plaintiff acknowledges that its leadership discussed the risks of not responding with counsel and weighed those risks against the potential costs of participation in this review and the likelihood that Plaintiff could be forced to participate in many future reviews if unsubstantiated allegations alleged by Chinese companies through third parties were sufficient to trigger review of ZH's exports.  See Oral Arg. 00:09:48–11:02.  Plaintiff further acknowledges that it considered that a consequence of its decision could include a decision by Commerce to stand by its decision not to rescind review.  Id. at 00:11:05–00:11:35.  Lastly, Plaintiff acknowledges that a consequence of Commerce's decision could cause it to decide to wind down its business.  Id.

caused by a negative determination by Commerce.  Here, the potential inequity of the risk

to Plaintiff, a sophisticated party that is cognizant of its potential exposure, is outweighed

by leaving CBP without recourse to secure potential ADD liability.  Plaintiff's failure to

anticipate CBP's STB requirement cannot excuse its ill-preparedness and

undercapitalization particularly where Plaintiff concedes that it knowingly exposed itself

to such risk.

### IV. <u>The Public Interest</u>

Plaintiff contends that, in the absence of an injunction, it will be forced out of

business and will accordingly lose its right to effective and meaningful judicial review.  Pl.

Mot. 27.  Plaintiff also contends that the public interest is also served by granting injunctive

relief because an injunction would ensure that the agencies uniformly and fairly enforce

the trade laws.  <u>Id.</u>  Defendant responds that Congress's decision to give CBP the

authority to require enhanced bonding evidences the strong public interest in protecting

the revenue of the United States.  Def.'s Resp. Br. 27.  Defendant also contends that

enjoining CBP from collecting security to protect against the loss of revenue essentially

would not serve the public interest in securing the revenue because it would deprive the

government of ADDs.  <u>See id.</u>  The court must determine whether the public interest

would be better served by issuing than by denying the preliminary injunction, <u>Zenith

Radio</u>, 710 F.2d at 809, "pay[ing] particular regard for the public consequences in

employing the extraordinary remedy of injunction."  <u>Winter</u>, 555 U.S. at 24. The public

interest in securing potential antidumping duties and in ensuring compliance with the

trade laws favors denying Plaintiff's motion.

Congress made clear that protecting the revenue of the United States is a significant public interest.  <u>See</u> 19 U.S.C. § 1623.  CBP's request that Plaintiff post STBs on its entries serves these interests by providing security that the appropriate ADDs will be paid on the entries.  The revenue that is to be protected by the STBs stems from potential antidumping duties due on Plaintiff's entries.  Plaintiff avers that it will not be able to post the collateral required to obtain STBs and will be forced into insolvency if required to post STBs on its entries that would be imported prior to Commerce issuing its final determination in June of 2017.  Pl. Mot. 11.  Thus, there is significant risk that Plaintiff would ultimately be unable to pay the antidumping duties that would be assessed if Commerce adheres to its preliminary determination.

The public interest is also served by permitting the agencies charged with enforcing the trade laws to implement measures that ensure accurate, effective, uniform, and fair enforcement of the trade laws by encouraging parties to cooperate with Commerce and respond to Commerce's questionnaires.  To grant the preliminary injunction motion would be to implicitly endorse exporters' non-cooperation with Commerce, which would be contrary to the significant public interest in promoting the accurate and effective, uniform and fair enforcement of the trade laws.  That Plaintiff has failed to demonstrate likelihood of success on the merits of its claim also undercuts its contention that granting its motion would promote the effective and fair enforcement of the trade laws.  CBP's collection of STBs on Plaintiff's entries serves these public interests by providing additional security that the appropriate antidumping duty will be paid on the entries.

**PUBLIC VERSION**

Although courts have long recognized that the loss of meaningful judicial review is an irreparable injury, <u>see, e.g.,</u> Zenith 710 F.2d at 810, Plaintiff does not allege that its claim would be legally barred.  Rather, Plaintiff alleges it will be out of business before being afforded the right to Commerce's review of its determination and judicial review of Commerce's determination.  Pl.'s Mot. 27.  For the reasons already discussed, Plaintiff has not established that it would be forced out of business while awaiting Commerce's final determination or the court's review of CBP's determination.

Plaintiff argues that the public interest favors granting its injunction because it is "not a bad actor."  Pl.'s Reply Br. 47.  Plaintiff further contends that it has a pristine record of compliance and a history of acting as a "whistleblower" against bad actors.  <u>See</u> <u>Id.</u>; <u>see also</u> Oral Arg. 01:15:53–01:16:08.  Thus, Plaintiff implies that the public interest favors granting it injunctive relief from STBs because it would encourage similarly situated parties who comply with the trade laws and, by extension, discourage exporters looking to game the system.  <u>See</u> Pl.'s Reply Br. 47; Oral Arg. 01:15:53–01:16:08.  Commerce is charged with administering the ADD laws, and CBP is charged with collecting and protecting the revenues associated with that administration.  Those agencies, and not the court, are in the best position in the first instance to distinguish good actors from bad and small risks to revenue from large ones.  The court lacks a record upon which to evaluate the interests and intent of Plaintiff.

## <u>CONCLUSION</u>

Plaintiff fails to make a sufficient showing on the factors to warrant granting its motion for a preliminary injunction.

**PUBLIC VERSION**

Therefore, upon consideration of Plaintiff's motion for preliminary injunction, Defendant's response thereto, Plaintiff's reply, and all other papers and proceedings in this action, and upon due deliberation, it is hereby

**ORDERED** that Plaintiff's motion for preliminary injunction is denied.


                                                                     /s/ Claire R. Kelly
                                                                    Claire R. Kelly, Judge


Dated: February 7, 2017
       New York, New York